UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

OSPREY-TROY OFFICENTRE L.L.C,
a Michigan limited liability company,

    Plaintiff,         Case No. 10-11337
                 Honorable Julian Abele Cook, Jr.
v.

WORLD ALLIANCE FINANCIAL CORP.,
f/k/a VERTICAL LEND, INC, a New York
corporation,

    Defendant.
_____/

ORDER

  The Plaintiff, Osprey-Troy Officentre, L.L.C. ("Osprey"), initiated this lawsuit in an effort to obtain a declaratory judgment and damages against the Defendant, World Alliance Financial Corporation, formerly known as Vertical Lend, Inc. ("World Alliance") for (1) the breach of a commercial lease, (2) its silent fraud in connection therewith, and (3) a violation of its rights as a third-party beneficiary to a sublease between the Lear Corporation and World Alliance. On April 1, 2011, World Alliance filed a motion for a summary judgment with this Court, pursuant to Fed.R.Civ.P. 56 which will now be evaluated.

I.

  On December 12, 2003, two non-parties to this litigation entered into an agreement to lease the first five floors of a commercial office building at 300 East Big Beaver Road in Troy, Michigan. According to their agreement, these five floors were leased by the original landlord, 485 Properties, LLC, to the original tenant, the Lear Corporation ("Lear"). In December of 2006, the original

1

landlord assigned its rights in the lease to Osprey. Several months later (June 5, 2007), Lear executed a sublease agreement relating to the fourth floor of the office building with World Alliance. Osprey, although a non-signatory to the sublease, expressed its written approval of the sublease agreement, in a "Consent to Sublease" document ten days later.

Several provisions of the sublease appear to be relevant to the evaluation of the currently pending motion by the Court. First, in ¶ 17 of its sublease with Lear, World Alliance appears to have acknowledged the existence of certain property commitments and restrictions under the original lease:

> Subtenant has received and reviewed the [original lease]. . . . Except as provided below in Section 47, Subtenant agrees to undertake and be bound to Sublandlord and Landlord by all obligations, covenants, agreements, indemnities and restrictions which are set forth in the [original lease] in the same manner as these obligations, covenants, agreements, indemnities and restrictions are binding upon Sublandlord, as Tenant under the [original lease], except as expressly modified by this Sublease.

(Sublease at ¶ 17). In turn, Section 47 of the Sublease has exempted these two parties (Lear and World Alliance) from certain portions of the original lease in the following manner:

> Notwithstanding anything herein to the contrary, Section 4.01, 4.02, 6.01, 6.04 (as it relates to operating expenses) and 6.05 of the [original lease] shall not apply to the Subtenant or be deemed a part of this Sublease.

*Id.* at ¶ 47. These above-referenced portions in the original lease all relate to Lear's payment obligations to Osprey, such as the base rent amount, operating expenses, and the payment of property taxes. Moreover, certain provisions of the original lease govern the rights and responsibilities of the parties. In Osprey's view, this provision also incorporates ¶ 13.03 which grants it the right to collect rents directly from World Alliance in the event of a default by Lear:

> Upon the occurrence of an Event of Default, as defined under Section 18, if all or any part of the Premises are then sublet or assigned, Landlord, in addition to any other remedies provided by this [original lease] or by law, may, at its option, collect

> directly from the sublessee or assignee all rent becoming due to Landlord by reason of the subleting or assignment. Any collection by Landlord from the subleases or assignee shall not be construed to constitute a waiver or release of Tenant from the further performance of its obligations under this [original lease] or the making of a new Lease with such sublessee or assignee.

(Original lease at ¶ 13.03).

A similar provision appears in ¶ 7 of the "Consent to Sublease" which was signed by Osprey, Lear, and World Alliance:

> In accordance with Section 13.03 of the Lease, Subtenant and Tenant acknowledge and agree that upon the occurrence of an Event of Default under the Lease, the rent and other sums due under the Sublease shall be paid directly to the Landlord upon written notification by Landlord to Subtenant and Tenant. In the event Landlord declares the Tenant in default under the terms of the Lease, Landlord shall provide Subtenant with notice of the default (which shall not be construed to create an opportunity to cure on the part of the Subtenant nor shall it be considered to create a grace period) within a reasonable period of time after declaring such default.

(Consent to Sublease at ¶ 7).

According to ¶ 6 of the "Consent to Sublease," World Alliance - as the subtenant - also "acknowledge[d] and agree[d] to provide all covenants, agreements and indemnifications to and for the benefit of the Landlord as set forth in the [original lease] as they relate to the Subpremises. Nevertheless, ¶ 1 within the "Consent to Sublease" also indicated that "[n]othing contained in the Sublease shall be construed to create privity of estate or of contract between Subtenant and Landlord and Landlord shall not be bound to any of the terms, agreements, or provisions of the Sublease." *Id.* at ¶ 1.

In July 2009, Lear filed for Chapter 11 bankruptcy protection in the Southern District of New York. Lear also asked the bankruptcy court to reject its obligation to comply with the facially binding terms of the original lease. Osprey expressed its opposition to this request, contending, *inter alia,* that Lear had not vacated its lease space and continued to be in arrears with its financial

obligations under their lease agreement. On October 22, 2009, the Bankruptcy Court granted Lear's request, along with the entry of an order that was made retroactive to September 1, 2009.

The effect of the decision by the Bankruptcy Court on this case continues to be disputed by the parties.  It is the position of World Alliance that, in contravention of the terms within the "Consent to Sublease" document, Osprey never submitted a written request for the direct payment of the alleged lease arrearage. Thus, this claimed failure - in World Alliance's opinion - negated its obligation to make its payments directly to Osprey.  Further, World Alliance submits that Osprey was paid $600,000 - an amount that was based on Lear's contractual obligations under the original lease. World Alliance also asserts that $456,484.60 of the above-listed amount reflects a payment for its occupancy of the leased space between the filing date of the bankruptcy petition and the decision by the Bankruptcy Court.

Osprey disagrees, contending that Lear's rejection of the original lease (1) operated as a breach (rather than a termination) of the parties' agreement, and (2) failed to relieve World Alliance of its obligations under the "Consent to Lease," the sublease, and the original lease agreement.


Less than five months after the decision by the Bankruptcy Court, Osprey initiated this lawsuit in the Oakland County (Michigan) Circuit Court in an effort to recoup those monies, to which it claims an entitlement under the terms of its agreements with World Alliance. On April 5, 2010, World Alliance caused the case to be removed to this federal court.

## II.

According to Fed. R. Civ. P. 56(c), a motion for a summary judgment should be granted if a party "show[s] that there is no genuine issue as to any material fact and that [it] is entitled to a

judgment as a matter of law." The burden is on the movant to demonstrate the absence of a genuine issue of a material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In assessing a summary judgment motion, the Court is obliged to examine all of the pertinent pleadings, depositions, answers to interrogatories, admissions, and affidavits in a light that is most favorable to the nonmoving party. Fed. R. Civ. P. 56(c); *Boyd v. Ford Motor Co.,* 948 F.2d 283, 285 (6th Cir. 1991); *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984). It is the responsibility of the court to determine "whether . . . there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. A dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Hence, a summary judgment must be entered only if (1) the evidence clearly suggests that the contested matter is "so one-sided that [the proponent] must prevail as a matter of law," *id.* at 252, or (2) the opponent fails to present evidence which is sufficient to establish the existence of an element essential to its case, and on which it will bear the burden of proof at trial. It is significant to note that the presentation of a mere scintilla of supporting evidence is insufficient. *See Anderson*, 477 U.S. at 252, *quoted in Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).

The questions of whether World Alliance is entitled to a summary judgment on any of Osprey's claims for (1) breach of the original lease, (2) silent fraud, (3) damages as a third-party beneficiary, and (4) the entry of a declaratory judgment are considered in turn below.

A.

To prevail on a claim for breach of contract under Michigan law, a plaintiff must first establish the elements of a valid contract. *In re Brown,* 342 F.3d 620, 628 (6th Cir. 2003) (citing

5

*Pawlak v. Redox Corp.*, 182 Mich. App. 758 (1990)). Those elements include (1) the identities of the parties who are competent to execute an enforceable contract, (2) a proper subject matter, (3) legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation. *Id.* Once a plaintiff has proven the existence of a valid contract, it - as the aggrieved party - has the obligation to prove by a preponderance of the evidence (1) the terms of the contract, (2) a violation of those terms by the defendant, and (3) the claimed harm. *Id.*

Here, World Alliance contends that Osprey's breach of contract action must fail as a matter of law because, in essence, there was no valid and enforceable contract between them. Specifically, it is World Alliance's belief that (1) there was no privity of contract between the parties under the original lease or the sublease, (2) the sublease was extinguished upon the decision by the Bankruptcy Court, and (3) its agreement to terminate the sublease with Lear[1] was valid and ended the legal efficacy of the sublease, as well as any of its obligations thereunder. Furthermore, World Alliance submits that even if these contractual instruments are deemed to be valid, it did not violate any of its terms because the requisite condition precedent by Osprey was never accomplished and, as such, this failure extinguished its obligation to pay.

(i)     Lack of Privity of Contract

As to World Alliance's first argument (i.e., the absence of a privity of contract), its analysis misses the mark. It is true that under the traditional common-law rule only the parties in privity are

---

[1]The parties never sought to acquire the approval of the Bankruptcy Court prior to their execution of this document. Furthermore, it is the contention of World Alliance that the 4th floor subleased space has now been vacated - a claim that was allegedly acknowledged by Osprey when the bankruptcy case was filed on August 19, 2009. World Alliance also contends that Osprey was notified on October 13, 2009 that it and Lear had agreed to terminate their sublease agreement.

entitled to sue. 13 WILLISTON ON CONTRACTS § 37:1 (4th ed.). Yet, Michigan, like other jurisdictions, has abandoned a strict application of the common-law rule in many areas of law because of its harshness and inflexibility. *Schunk v. Zeff & Zeff, P.C.*, 109 Mich. App. 163, 180 (1981). The third-party beneficiary doctrine is one such exception. *Id.* Here, Osprey asserts that, despite not being a party in the sublease agreement with World Alliance, it should be recognized as a third-party beneficiary. If proven, this view of its status would be in accordance with Michigan law. *See generally, Shay v. Aldrich,* 487 Mich. 648, 665 (Mich. 2010) (noting that "a third-party beneficiary effectively 'stands in the shoes' of the original promisee and 'has the same right to enforce said promise that he would have had if the said promise had been made directly to him as the promisee[,]'" and citing *Williams v. Polgar*, 391 Mich. 6, 14 (1974) as a case "recognizing third-party beneficiaries as an exception to the common-law privity rule[.]")); *See also,* WILLISTON ON CONTRACTS, *supra* ("Depending on the particular jurisdiction, the third party beneficiary doctrine either dispenses with the need for privity or asserts that privity, by virtue of the party's status as a third party beneficiary, in fact exists. In either case, the third party is treated no differently with respect to the enforcement of the promise than a party in traditional privity of contract.").With these principles in mind, the Court turns its attention to whether Osprey may validly claim third-party beneficiary status, which is a question of law. In Michigan, the rights of third-party beneficiaries are determined by statute:

> Any person for whose benefit a promise is made by way of contract, as hereinafter defined, has the same right to enforce said promise that he would have had if the said promise had been made directly to him as the promisee.
>
> (1) A promise shall be construed to have been made for the benefit of a person whenever the promisor of said promise had undertaken to give or to do or refrain from doing something directly to or for said person.

7

Mich. Comp. Laws § 600.1405 (1996). The Michigan Supreme Court, in its interpretation of this statute, has opined that the Legislature intended to assure that contracting parties are "clearly aware that the scope of their contractual undertakings encompasses a third party, directly referred to in the contract, before the third party is able to enforce the contract." *Schmalfeldt v. North Pointe Ins. Co.,* 469 Mich. 422, 428 (2003). Using an objective standard, a court is to determine "from the form and meaning of the contract itself, whether the promisor undertook to give or to do or to refrain from doing something directly to or for the person claiming third-party beneficiary status." *Id.* (citing *Koenig v. South Haven,* 460 Mich. 667, 677 (1999)). Michigan courts have held that only intended - not incidental - third-party beneficiaries may sue for a breach of a contractual promise in their favor. *Brusnell v. City of Zeeland,* 467 Mich. 293, 296 (2002) (noting that Mich. Comp. Laws § 600.1405 draws a distinction between intended third-party beneficiaries who may sue for a breach of a contractual promise in their favor, and incidental third-party beneficiaries who may not.").

Here, a review of the relevant provisions of the sublease, the "Consent to Lease," and the original lease agreement all merit a finding that Osprey is an intended third-party beneficiary of the sublease. First, it is important to note that Osprey is identified specifically by name as the "Landlord" under the opening terms of the sublease. (Sublease at Recital A). Thereafter, there are several places within the sublease wherein World Alliance has agreed to govern itself in accordance with the financial and other requirements that were imposed upon Osprey under the terms of the original lease. For instance, in ¶ 17, after acknowledging that it received and reviewed the original lease, World Alliance specifically covenanted that, as the named Subtenant it "shall not do or permit anything to be done in the Subpremises . . . which would violate any Lease covenants, terms or agreements." (Sublease at ¶ 17). Without this language, World Alliance would have presumably

have been free to occupy the 4th Floor according to its own agenda and business priorities. Hence, the Court deems this commitment as having conferred a duty on World Alliance to "do or refrain from doing something" in a way that would otherwise benefit Osprey directly. This conclusion is buttressed by the existence of several original lease provisions which (1) operate demonstrably to Osprey's advantage and (2) are specifically referenced in ¶ 17 of the sublease (among other places), including "without limit, the obligation to provide insurance, pay personal property taxes and make repairs and replacements as more fully set forth in the [Prime] Lease." *Id.* Such duties quite obviously represent an undertaking by World Alliance to take specific steps to protect Osprey's investment against damage, loss of ownership, and general disrepair. Significantly, World Alliance does not address these provisions in its pleadings.

The Court finds additional support for its position in the language of the "Consent to Sublease," which repeats World Alliance's promise to abide by "all covenants, agreements and indemnifications to and for the benefit of the Landlord as set forth in the [Prime] Lease as they relate to the Subpremises," and further notes that in accordance with Section 13.03 of the Lease, World Alliance agrees that "rent and other sums due under the Sublease shall be paid directly to the Landlord upon written notification" in the event of a default under the Lease. ("Consent to Lease" at ¶¶ 6,7. By agreeing to such terms, World Alliance promised to conduct itself in accordance with the desires of Osprey, as expressed in the default provisions of the original lease which Osprey had negotiated to protect its own interests. To be sure, in the absence of the strictures of ¶ 7, World Alliance would have been free in such a situation to send the sublease payments to whomever or wherever it deemed fit. Yet, according to the terms of the "Consent to Lease," its options were limited to Osprey's desires. In the opinion of the Court, this elevates Osprey's status to more than

a non-essential party who has been casually named in an agreement with Lear. To the contrary, the Court finds that Osprey is, in fact, a third-party beneficiary that is entitled to assert claims under the contract as if it were standing in the shoes of the parties.

Furthermore, the Court is not persuaded by World Alliance's argument that the parties expressly disclaimed third-party beneficiary status in the "Consent to Lease" document. Although that agreement did note that "nothing in the Sublease shall be construed to create privity of estate or contract between Subtenant and Landlord," this language cannot be viewed in isolation from the foregoing provisions, which paints a compelling picture of Osprey as an intended third-party beneficiary under the terms of the sublease. In the opinion of the Court, an express disclaimer of privity does not foreclose a conclusion that - when viewed objectively - Lear and World Alliance were clearly aware that the scope of their sublease encompassed Osprey as third party with potential rights under the contract. Furthermore, World Alliance's reliance on *Krammer Asphalt Paving Co., Inc. V. East China Tp. Schools,* 443 Mich. 176, 190 (1993) is misplaced, inasmuch as the disclaimer therein was not central to the analysis by the court. Rather, relief was denied because the plaintiff was (1) merely an incidental beneficiary, and (2) attempting to recover as a third-party beneficiary where no promises had been made on its behalf. *Id.*

Because the Osprey may proceed as a third-party beneficiary under the sublease, World Alliance's motion for a summary judgment on this issue must fail.

    (ii)    <u>Impact of Bankruptcy Proceedings on Validity of Sublease</u>

Alternatively, World Alliance argues that even if the sublease is determined to be valid, it was extinguished by the order of the Bankruptcy Court on October 22, 2009. On the strength of this theory, World Alliance maintains that Osprey, without any continuing right to receive payments

under the sublease, is without any basis upon which to assert a contractual right to collect rental income. As authority for this proposition, World Alliance cites several bankruptcy cases which stand for the proposition that when a lease is rejected under 11 U.S.C. § 365(d)(4)[2], the result is a breach and termination of the lease, and the leasehold sublessees retain no interest that can be pursued in a bankruptcy court or a state court. *See, e.g. Chatlos Systems, Inc. v. Kaplan*, 147 B.R. 96, 98 (D. Del. 1992) ("when a lease is deemed rejected pursuant to § 365(d)(4), any subleases under that primary lease must also be deemed rejected since the sublessee's rights in the property extinguish with those of the sublessor."); *In re Elephant Bar Restaurant, Inc.*, 195 B.R. 353, 356 (W.D. Pa. 1996) ("a § 365(d)(4) deemed rejection of a lease, while not necessarily extinguishing the rights therein of a nondebtor third party, nevertheless automatically extinguishes the rights therein of a debtor and/or bankruptcy trustee. With respect to a nondebtor third party, the lease may still exist but third party rights therein survive only if mentioned explicitly therein and/or to the extent

---

[2]This provision states, in relevant part that:

(4)(A) Subject to subparagraph (B), an unexpired lease of nonresidential real property under which the debtor is the lessee shall be deemed rejected, and the trustee shall immediately surrender that nonresidential real property to the lessor, if the trustee does not assume or reject the unexpired lease by the earlier of--

    (i)      the date that is 120 days after the date of the order for relief; or

    (ii)     the date of the entry of an order confirming a plan.

(B)    (i)      The court may extend the period determined under subparagraph (A), prior to the expiration of the 120-day period, for 90 days on the motion of the trustee or lessor for cause.

    (ii)     If the court grants an extension under clause (i), the court may grant a subsequent extension only upon prior written consent of the lessor in each instance.

recognized under pertinent nonbankruptcy law.").

In response, Osprey notes that the rejection of the original lease by the Bankruptcy Court was in the form of a breach, not the declaration of a termination which would divest it of all remedies outside of bankruptcy law. As such, it is Osprey's position that the rights of the parties are completely unaffected by the bankruptcy proceedings. To support its argument, Osprey cites 11 U.S.C. § 365(g), which states, in pertinent part, that "[e]xcept as provided in subsections (h)(2) and (i)(2) of this section [neither of which apply here], the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease." Osprey then turns to case law to support its view that a rejected lease is not the same as a terminated lease. Rather, it submits that such a declaration is merely treated as a breach immediately prior to the bankruptcy petition date. *See generally, In re Stoltz*, 315 F.3d 80, 86 n.1 (2nd Cir. 2002).

A review of the relevant authorities clearly suggests that Osprey's position on this issue is correct.

Termination, as allowed by a contract, presents a distinct question from the issue of the rejection or assumption of the contract in a bankruptcy proceeding. *In re North American Royalties, Inc.*, 276 B.R. 860 865 (E.D. Tenn. 2002). *See also*, 31 WILLISTON ON CONTRACTS § 78:61 (4th ed.) ("[r]ejection of an unexpired lease by the debtor cuts off any right of the lessor to require the debtor perform and limits the lessor's claim to one for breach of contract. A rejected lease or contract is treated as if the debtor breached it immediately prior to the petition date, and the parties are generally left with the rights and remedies available outside of bankruptcy law.").

In its pleadings, it appears that World Alliance conflates these two concepts by automatically assuming that a rejection of the lease in bankruptcy yields termination. However, this

is an incorrect assumption. *See, e.g. Leasing Service Corp. v. First Tennessee Bank National Association,* 826 F.2d 434 (6th Cir. 1987) ("Rejection denies the right of the contracting creditor to require the bankrupt estate to specifically perform the then executory portions of the contract. Rejection also limits the creditor's claim to damages for breach of contract.").

Inasmuch as World Alliance has not established that the sublease was terminated as a matter of law, its attempt to acquire a summary judgment on Osprey's breach of contract claim on this basis must fail.

(iii) <u>Impact of Termination Agreement on Sublease</u>

World Alliance argues that the Termination Agreement between itself and Lear operated to end the Sublease on August 31, 2009, before the Prime Lease was rejected by the bankruptcy court effective September 1, 2009. It claims that it acted well within its rights to terminate the Sublease, and that nothing in the bankruptcy code prevented Lear from executing such a document as part of its ordinary course of business.

In response, Osprey argues that the Termination Agreement is unenforceable inasmuch as Lear and World Alliance executed that document without Osprey's knowledge or consent. Osprey argues that parties to a third-party beneficiary contract cannot rescind such an agreement once the beneficiary has accepted the contract. In support of this argument Osprey cites a number of cases from other jurisdictions. *See generally, Blackard v. Monarch's,* 131 Ind. App. 514 (1960): *Dodge v. Moss,* 82 Ky. 441 (1884); *Rogers v. Gosnell,* 58 Mo. 589 (1875); and *Hills v. Hoeldtke,* 104 Tex. 594 (1912). Osprey's view finds support in Williston as well, which offers the following summary of the majority rule: "in the absence of . . . a [specific contract] term, the promisor and promisee retain power to discharge or modify [a duty to an intended beneficiary] by subsequent agreement.

13

Such a power terminates with the beneficiary, before he receives notification of the discharge or modification, materially changes his position in justifiable reliance on the promise or brings suit on it or manifest assent to it at the request of the promisor or promissee." 13 WILLISTON ON CONTRACTS § 37:57 (4th ed.).

Notwithstanding the attractiveness of this reasoning in the abstract, there is little Michigan case law to support Osprey's position under the circumstances here, where a subtenant and sublandlord are in agreement about terminating their contract. Under Osprey's interpretation, a landlord would always need consent to end such an arrangement, and there is no reason to doubt that in certain circumstances (like a down economy), assent to terminating the agreement could be withheld unreasonably. Moreover, the record indicates that Lear requested and received permission from the Bankruptcy Court reject the sublease, and that the court there was on notice that World Alliance and Lear were voluntarily terminating the agreement. Nevertheless, Osprey did nothing to challenge this action in that forum, before the Court best-positioned to prevent what Osprey now characterizes as an obvious violation of bankruptcy law. Its belated attempt to now have the Termination Agreement declared void under bankruptcy principles is, therefore, unavailing. The Court agrees with World Alliance that the Termination Agreement was valid and enforceable independent of Osprey's consent, and summary judgment on this basis will be granted, notwithstanding Osprey's status as a third-party beneficiary.

B.

Next, World Alliance contends that Osprey cannot sustain its claim for silent fraud. In order to prevail under this theory under Michigan law, a plaintiff must plead and prove the existence of a false or misleading representation that is made under circumstances where there was a legal or

equitable duty to disclose. *U.S. Fidelity and Guaranty Co. v. Black*, 412 Mich. 99, 124 (1981). When establishing fraud, there must be evidence that (1) the defendant made a material representation; (2) it was false; (3) when the representation was made, the defendant knew that it was false, or made it recklessly without any knowledge of its truth, and as a positive assertion; (4) the defendant made the representation with the intention that it should be acted upon by the plaintiff; (5) the plaintiff acted in reliance upon it; and (6) a harm was suffered by the plaintiff as a result thereof. *Hi-Way Motor Co. v. International Harvester Co.*, 398 Mich. 330, 336 (1976). Each of these facts must be proven with a reasonable degree of certainty, and all of them must be found to exist. The absence of any one of these elements presents a complete bar to recovery. *Id.*

Here, World Alliance contends that Osprey's complaint is devoid of any facts that, if proven, would establish a cause of action for silent fraud. Upon reviewing the record, the Court concludes that World Alliance's position is correct. At most, the complaint accuses World Alliance of abdicating its duty to "notify and involve [Osprey] in the negotiations concerning the termination of the Sublease." (Complaint at ¶ 29-30). Yet, such an omission - even if true - does not amount to a false or misleading representation in the face of a legally-imposed duty to disclose certain facts. *See, e.g. Van Emon v. State Farm Mut. Auto. Ins., Co.,* No. 05-72638, 2008 WL 2446962, *3 (E.D. Mich. Jun. 18, 2008) ("Mere nondisclosure is not enough to state a claim for silent fraud; the plaintiff must show that the party suppresses part of the truth when asked."). Furthermore, Osprey has not advanced any meaningful response to this argument. Indeed, in its responsive pleading, Osprey devotes virtually no space whatsoever to addressing the arguments by World Alliance on these points.

In fact, Osprey has not proffered any evidence, for example, that World Alliance

15

purposefully hid or withheld information, or ever claimed that its lease term would continue unabated. Furthermore, no legal or equitable principle has been advanced by Osprey that would have given rise to a duty by World Alliance to disclose the Termination Agreement.

Inasmuch as Osprey has failed and/or neglected to present even a mere scintilla evidence to resist World Alliance's application for relief, this motion for summary judgment will be granted.

### C.

Finally, World Alliance correctly notes that, under the Declaratory Judgment Act, 28 U.S.C. § 2201,"[i]n a case of actual controversy within its jurisdiction . . . , any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." That notwithstanding, § 2201 does not, in itself, create an independent cause of action. *Davis v. United States*, 499 F.3d 590, 594 (6th Cir. 2007).[3] And, in light of the finding by this Court that World Alliance's request for the entry of a summary judgment on the breach of contract is warranted, its request for a dismissal of the declaratory judgment count must also be granted.

### III.

For the reasons that have been stated above, World Alliance's motion for the entry of a summary judgment as it relates to Osprey's claim for silent fraud, breach of contract, and request for a declaratory judgment must be, and is granted. The lawsuit is dismissed in its entirety.

IT IS SO ORDERED.

---

[3] Rather, before a plaintiff can invoke the protections of the Declaratory Judgment Act, a federal court must have exercised its jurisdiction under some other federal statute. *Id.*

16

Date: September 30, 2011           s/Julian Abele Cook, Jr.
                                   JULIAN ABELE COOK, JR.
                                   U.S. District Court Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on September 30, 2011

                                   s/ Kay Doaks
                                   Case Manager